Transcript of the Testimony of

**Judy Singley**
March 2, 2011

**Singley v. Aacres Landing, Inc., et al.**
No. C09-5443 RBL



## Byers and Anderson, Inc.

**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Taccoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

EXHIBIT A

6

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA


| | |
|---|---|
| JUDY SINGLEY, individually and as Guardian for DANA LOUISE SINGLEY, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No. C09-5443 RBL ) |
| AACRES LANDING, INC., a Corporation, and the STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, DIVISION OF DEVELOPMENTAL DISABILITIES, | ) ) ) ) ) ) |
| Defendants. | ) |


VIDEOTAPED DEPOSITION OF JUDY SINGLEY

March 2, 2011

Tacoma, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing


| | |
|---|---|
| One Union Square | 2208 North 30th Street, Suite 202 |
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com. |


Serving Washington's Legal Community since 1980

Page 2

```
 1                        APPEARANCES

 2            For the Plaintiffs:

 3                    Jeffrey R. Caffee
                      Pfau Cochran Vertetis Kosnoff
 4                    911 Pacific Avenue
                      Suite 200
 5                    Tacoma, WA 98402
                      253.777.0799
 6                    253.627.0654 Fax
                      jeffrey@pcvklaw.com
 7

 8            For the Defendant State of Washington:

 9                     Ian M. Bauer
                      Assistant Attorney General
10                    7141 Cleanwater Drive Southwest
                      P.O. Box 40126
11                    Olympia, WA 98504-0109
                      360.586.6310
12                    360.586.6655 Fax
                      ianb@atg.wa.gov
13

14            For Defendant Aacres Landing, Inc.:

15                    Dennis J. La Porte
                      Krilich, La Porte, West & Lockner
16                    524 Tacoma Avenue South
                      Tacoma, WA 98402
17                    253.383.4704
                      253.383.8053 Fax
18                    Laporte@524law.com

19

              Also present: Chad Reilly
20                       Videographer, Byers & Anderson, Inc.
                         Court Reporters & Video
21

22

23

24

25
```

Page 3

1                          EXAMINATION INDEX

2         EXAMINATION BY:                        PAGE NO.

3         Mr. Bauer                                  6

4         Mr. La Porte                              71

5

6                          EXHIBIT INDEX

7         EXHIBIT NO.     DESCRIPTION            PAGE NO.

8         Exhibit No. 1   25-page Individual Support Plan    19
                          dated 8/9/07; 01040917-941
9

          Exhibit No. 2   5-page Individual Support Plan     25
10                        dated 1/31/08; 01040942-947

11        Exhibit No. 3   25-page Individual Support Plan    33
                          dated 10/2/08; 01040880-904
12

          Exhibit No. 4   4-page Individual Support Plan     33
13                        dated 11/30/08; 01040905-908

14        Exhibit No. 5   27-page Individual Support Plan    35
                          dated 7/10/09; 01040746-772
15

          Exhibit No. 6   27-page Individual Support Plan    36
16                        dated 10/7/10; 04010001-027

17        Exhibit No. 7   9-page Individual Support Plan     36
                          dated 11/30/10; 04010039-047
18

          Exhibit No. 8   1-page ISP Meeting Wrap-up dated   39
19                        10/2/08; 01040912-913

20        Exhibit No. 9   1-page Assessment Meeting          40
                          Wrap-up dated 10/7/10; 04010048
21

          Exhibit No. 10  1-page letter to Ms. delight       51
22                        from Mr. Garrett and Ms. Borden
                          dated 6/22/07; 01040348
23

          Exhibit No. 11  5-page letter to Ms. Kas from      61
24                        Ms. Pech dated 5/1/08;
                          01040639-643
25

9

Page 4

```
 1                         EXHIBIT INDEX (Continuing)

 2       EXHIBIT NO.      DESCRIPTION                    PAGE NO.

 3       Exhibit No. 12   2-page Waiver Exception-to-Rule    62
                          Request dated 6/29/07; 01040955
 4
         Exhibit No. 13   2-page Waiver Exception-to-Rule    64
 5                        Request dated 8/16/07; 01040951

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

10

1                      BE IT REMEMBERED that on Wednesday,

2    March 2, 2011, at 911 Pacific Avenue, Tacoma, Washington,

3    at 1:34 p.m., before Cindy M. Koch, Certified Court

4    Reporter, RPR, CRR, CLR, appeared JUDY SINGLEY, the

5    witness herein;

6                      WHEREUPON, the following proceedings

7    were had, to wit:

8

9                      <<<<<< >>>>>>

10

11                     THE VIDEOGRAPHER:  We are now on the

12   record.  My name is Chad Reilly, videographer for Byers &

13   Anderson, Court Reporters & Video.  Our address is 2208

14   North 30th Street, Suite 202, Tacoma, Washington 98403.

15   Our telephone number is (253) 627-6401.  Today is

16   March 2nd, 2011.  The time is now 1:34 p.m.

17       This is the videotaped deposition of Judy Singley,

18   being taken on behalf of the defense in the matter of

19   Singley vs. Aacres Landing, Inc., and the State of

20   Washington, Cause No. CV 05443.  The deposition is being

21   held at 911 Pacific Avenue in Tacoma, Washington.

22       Will the attorneys present please introduce

23   themselves for the record.

24                     MR. CAFFEE:  Jeff Caffee, for the

25   plaintiff.

Page 20

```
 1          need my glasses.  I'm at that age.  If I can find my

 2          glasses.

 3     Q    (By Mr. Bauer)  Ms. Singley, you've been handed what's

 4          been marked as Exhibit 1 to this deposition.

 5              What is this document?

 6     A    It says, "Individual Support Plan, Current Initial DDD

 7          Assessment Details."

 8     Q    There's an assessment date of August 9th of 2007.

 9              Do you see that?

10     A    Yes, I do.

11     Q    Now, your daughter Dana is a client of the Department of

12          Social & Health Services, correct?

13     A    Correct.

14     Q    And to be specific, she's a client of the Division of

15          Developmental Disabilities, correct?

16     A    Yes.

17     Q    Do you believe that your daughter is developmentally

18          disabled?

19     A    I do, yes.

20     Q    And how would you, in your own words, describe what her

21          disabilities are?

22     A    Well, it's very complicated because she appears so high

23          functioning that sometimes she can fool the experts.  I

24          believe, and this is what she's been diagnosed by

25          different providers, bipolar, Asperger's syndrome,
```

12

```
 1          obsessive-compulsive.  She's had different diagnoses in

 2          the past, but those are what I would consider the main

 3          ones.

 4     Q    To the best of your understanding, is your daughter

 5          currently experiencing the symptoms of PTSD?

 6     A    Yes.

 7     Q    Any -- and -- any other current diagnoses that you can

 8          think of?

 9     A    I can't think of any others right now.

10     Q    Fair enough.

11              An individual support plan, or ISP, in your own

12          words, what is this document?  What is an ISP?

13     A    Well, to me, that means -- to me, it comes down to based

14          on -- on what we feel her needs are that qualifies her

15          for services from the State.  That's what I think it

16          boils down to.

17     Q    Okay.  And the ISP also addresses some specifics about

18          what services Dana might need, correct?

19     A    Correct.

20     Q    And in order to prepare an ISP, how -- or let me back up

21          and strike that.

22              How is an ISP prepared?

23     A    The caseworker comes out to the house on an annual basis,

24          and then she has a laptop and we go through a series of

25          questions.  And it -- it takes a pretty long time.  And
```

```
 1        then that's what it's based on.  And then we get a draft

 2        in the mail for me to sign, and then it's in her file.

 3    Q   Who is Dana's current caseworker?

 4    A   Teri O'Donnell.

 5    Q   And so Ms. O'Donnell would come out to you --

 6    A   Uh-huh.

 7    Q   -- and meet with you, correct?

 8    A   Me, and hopefully Dana's out of bed because she likes her

 9        to be part of it.

10    Q   Okay.  But you would participate in the -- in the

11        preparation of an ISP --

12    A   Yes.

13    Q   -- generally speaking?

14    A   Yes.

15    Q   Okay.  And if we look at the document that's been marked

16        as Exhibit 1, with an assessment date of August 9th of

17        2007, both you and Dana participated in the creation of

18        this ISP, correct?

19    A   If that's what it says.  I can't remember back that far,

20        but --

21    Q   Well, if you turn over to Page 2 of the exhibit -- strike

22        that.

23            Have you ever not participated in the preparation of

24        an ISP?

25    A   No.
```

14

1    Q    Okay.  And if you turn over to Page 2 of Exhibit 1,

2         towards the top, there's a section marked "Other Sources

3         of Information."

4              Do you see that?

5    A    **Yes, I do.**

6    Q    And it identifies both you and your daughter Dana,

7         correct?

8    A    **Yes.  Excuse me.**

9    Q    So you would have participated in the preparation of this

10        ISP, right?

11   A    **Yes.**

12   Q    And if -- when you're sitting down and talking with

13        Ms. O'Donnell, just generally speaking -- I'm not talking

14        about August of '07 here, so let me ask the question

15        again.

16             Generally speaking, when you're working with

17        Ms. O'Donnell to prepare an ISP, you have the opportunity

18        to suggest revisions to the services that Dana's

19        receiving at that time, correct?

20   A    **I don't remember that.**

21   Q    Well, if you think -- let me -- let me put it this way:

22        If you believe that Ms. O'Donnell -- strike that.

23   A    **Uh-huh.**

24   Q    Hypothetically speaking, if Ms. O'Donnell were to come to

25        your house tomorrow to talk about -- to do a new

15

```
 1                 Do you see that?

 2       A    I do.

 3       Q    Had you ever filed an appeal with DSHS over the level of

 4            services that had been provided to Dana?

 5       A    I did not.

 6       Q    And just to make sure, that is your signature, correct,

 7            on the last --

 8       A    Yes.

 9       Q    -- page of Exhibit 2?

10       A    Yes.

11       Q    Thank you.  I --

12       A    Can I expand upon that answer, or is that appropriate or

13            not?

14                       MR. CAFFEE:  Well, just wait for him

15            to pose a question and --

16                       THE WITNESS:  Okay.

17                       MR. CAFFEE:  -- then you answer.

18                       THE WITNESS:  Okay.

19       Q    (By Mr. Bauer)  So you testified a minute ago that you

20            have -- you've never filed an appeal with respect to the

21            services being provided to your daughter?

22       A    I have not.

23       Q    So what is it that you feel needs to be explained about

24            that?

25       A    I've never done the process of the right to appeal.
```

16

Page 28

```
 1          However, I was in contact with Aacres and DDD all

 2          along -- phone calls, memos, e-mails -- with concerns

 3          that I had.  And frankly, appealing, I never got anywhere

 4          doing that.  I just felt the efforts were fruitless.

 5     Q    Well, just to be clear, you never -- you never filed an

 6          appeal with DSHS about the services that were described

 7          in an ISP or summary of an ISP?

 8     A    I did not, no.

 9     Q    Did you ever request additional services beyond what had

10          been agreed to?

11     A    I've many times said to DDD that we need to look at where

12          she's staying because it's not appropriate services for

13          Dana.  Her care isn't being taken care of.

14     Q    And when you say that, where are you referring to?

15     A    Where, like where she would go, you mean?

16     Q    No, no, no.  Where -- you're saying that where she's

17          staying is inappropriate.  I'm asking where you're

18          referring to when you're talking about that.

19     A    When she was at 67th Street --

20     Q    Okay.

21     A    -- by Aacres, it was a horrid condition for her.

22     Q    So you asked DDD to move her to a different residence?

23     A    Yes.  To help me find a place for her.

24     Q    When did you make those requests?

25     A    Many times, many times.
```

17

1  A  No.  But they didn't help me, either.  Is that the

2     answer -- I mean, I -- is that the question, or --

3  Q  My question was whether they prevented you from doing

4     that?

5  A  No.  Whoops.  Sorry.  I'll take them off.

6  Q  When did Dana first move to Aacres, approximately?

7  A  Oh, I don't remember the year, actually.  She would have

8     been like 19-ish.

9  Q  How often, generally speaking, is Dana's ISP reviewed?

10 A  Well, we do it annually.  It's typically in October,

11    November.

12 Q  As of the -- to come back to Exhibits 1 and 2 and the ISP

13    that was prepared in October of 2007, and the summary

14    that you signed in January of 2008, did you disagree with

15    any of the -- with anything that's set forth in either

16    Exhibit 1 or 2 in any way, shape, or form?

17 A  No, I don't think so.  We kind of -- when Teri, the case

18    manager, comes to the house, we kind of come to a

19    decision and base it on that.

20 Q  And she consults with you about that decision, correct?

21 A  Yes.

22 Q  Do you believe that she takes your opinions into

23    consideration when preparing an ISP generally?

24 A  I think she does.

25 Q  Do you believe that Ms. O'Donnell takes Dana's thoughts

Page 33

```
 1        into consideration when preparing the ISP?

 2   A    I do.

 3   Q    And just to make sure we're clear, that last question, I

 4        was asking about preparing ISPs in general, not a

 5        specific one.

 6   A    Right.

 7   Q    Okay.  That was your understanding?

 8   A    Yes.

 9                         (Exhibit Nos. 3-4 marked

10                            for identification.)

11   Q    (By Mr. Bauer)  So, Ms. Singley, you have been handed

12        what have been marked as Exhibits 3 and 4 to this

13        deposition.

14            What is Exhibit 3?

15   A    Individual support plan, current annual DDD assessment

16        details.

17   Q    And it's for an assessment dated October 2nd of 2008,

18        correct?

19   A    Correct.

20   Q    And you participated in the preparation of this ISP,

21        correct?

22   A    Yes.

23   Q    And what is Exhibit 4?

24   A    Individual support plan, current DDD service summary.

25   Q    And again relating to the October 2, 2008, assessment,
```

19

1       correct?

2    A   **Yes.**

3    Q   And you received a copy of both Exhibits 3 and 4 in 2008,

4        right?

5    A   **Yes.**

6    Q   Did you disagree with anything at all in Exhibits 3 and 4

7        when you prepared this ISP or received the ISP and

8        summary in 2008?

9    A   **Not that I recall, no.**

10   Q   And when you sat down with Ms. O'Donnell to prepare this

11       ISP, you again had an opportunity to suggest any changes

12       or revisions to your daughter Dana's services, correct?

13   A   **Correct.**

14   Q   And you didn't do that, did you?

15   A   **No, I didn't.**

16   Q   And you didn't file an appeal with respect to the

17       services that were being provided, correct?

18   A   **Correct.**

19   Q   And Exhibit 4, if we could turn back to that one for one

20       quick second.  This is an accurate summary, Exhibit 4, of

21       the services that were identified in the 2008 ISP,

22       correct?

23   A   **Correct.**

24   Q   And of the services that she was receiving at that time?

25   A   **Yes.**

20

```
 1                              (Exhibit No. 5 marked for

 2                          identification.)

 3     Q    (By Mr. Bauer)  Ms. Singley, you've been passed what's

 4          been marked as Exhibit 5 to this deposition.

 5              Do you recognize this document?

 6     A    Yes.

 7     Q    This is an individual support plan and current term DDD

 8          assessment details regarding a July 10, 2009, assessment,

 9          correct?

10     A    Yes.

11     Q    And again, you participated in the preparation of this

12          document, correct?

13     A    Yes.

14     Q    And you had an opportunity to suggest any changes and

15          revisions you might like, correct?

16     A    Yes.

17     Q    And you didn't do that, did you?

18     A    No.

19     Q    And you didn't file any appeal with DSHS regarding the

20          services that were being provided to Dana as of July of

21          2009, correct?

22     A    Correct.

23     Q    I may have just asked you this, and if I did, please

24          forgive me, but you -- did you disagree with anything at

25          all that's set forth in Exhibit 5 when you participated
```

21

Page 36

1          in its preparation --

2    A   I don't --

3    Q   -- in July of 2009?

4    A   -- believe so.  I'm sorry.  I don't believe so, no.

5                        MR. BAUER:  Did that get down, Cindy?

6                        THE COURT REPORTER:  Yes.

7                        MR. BAUER:  Thank you.

8                           (Exhibit No. 6 marked for

9                            identification.)

10   Q   (By Mr. Bauer)  Ms. Singley, you've been handed what's

11       been marked as Exhibit 6 to this deposition.

12       And what is this document?

13   A   This says "Individual Support Plan, Current Annual DDD

14       Assessment Details."

15   Q   And this is for an assessment dated October 7th, 2010,

16       correct?

17   A   Correct.

18                        MR. BAUER:  We'll go ahead and mark

19       No. 7 right now, as well.

20                           (Exhibit No. 7 marked for

21                            identification.)

22   Q   (By Mr. Bauer)  Ms. Singley, you've also been handed

23       what's been marked as Exhibit 7.

24       What is this document?

25   A   Individual support plan, current DDD service summary.

**Judy Singley
March 2, 2011**

22

Page 37

1    Q   Again relating to the October 7, 2010, assessment,

2        correct?

3    A   **Correct.**

4    Q   And you participated in the preparation of what's been

5        marked as Exhibit 6, right?

6    A   **Yes.**

7    Q   And you had an opportunity to suggest any changes or

8        revisions you would like to this document, correct?

9    A   **Correct.**

10   Q   And did you, as of October of 2010, disagree with

11       anything set forth in Exhibit 6?

12   A   **Not that I recall, no.**

13   Q   And Exhibit 7, the current DDD service summary, this is

14       an accurate summary of the services that were being

15       provided to your daughter Dana as of October of 2010,

16       correct?

17   A   **Yes.**

18   Q   And if we turn towards the back of this, there are two

19       fax signature pages, and the one on the last page, and

20       then two pages before that, there are -- do you see those

21       two signature pages?

22   A   **Yes, I do.**

23   Q   They appear to have been sent at two separate times, so

24       that's why I called your attention to them, but on the --

25       but they appear to be the same signatures.  Is that -- do

**Judy Singley**
**March 2, 2011**

23

Page 38

```
 1        you agree with that?

 2   A    Yes, I do.

 3   Q    Do you recall why this might have been faxed twice?

 4   A    Maybe -- I just guess that it's a problem with the fax

 5        machine.  Other than that, I wouldn't know.

 6   Q    Fair enough.

 7           And that is your signature on the line for legal

 8        representative, correct?

 9   A    Yes.

10   Q    And is that your daughter Dana's signature on the line

11        for participant?

12   A    Yes.

13   Q    And did you observe her sign that document?

14   A    Yes.

15   Q    And you didn't file any appeal with the Department of

16        Social & Health Services regarding the assessment and the

17        services that were being provided as of October of 2010,

18        correct?

19   A    Correct.

20                    MR. CAFFEE:  Perhaps now would be a

21        good time to take a quick little bathroom break?  You

22        want to take a short break?

23                    THE WITNESS:  Yeah, we can.  We can.

24                    MR. BAUER:  I'd actually like to

25        finish this line of questioning.  I've got two documents.
```

24

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 39

```
 1           This will take no more than two minutes.

 2                         MR. CAFFEE:  Okay.

 3                         THE WITNESS:  That's fine.

 4                              (Exhibit No. 8 marked for

 5                               identification.)

 6    Q    (By Mr. Bauer)  Okay.  Ms. Singley, you've been handed

 7         what's been marked as Exhibit 8.

 8           What is this document?

 9    A    ISP meeting wrap-up.

10    Q    And if you look at the second page, there's a legal

11         representative's signature.

12           Do you see that?

13    A    Yes.

14    Q    That's your signature, correct?

15    A    Yes, it is.

16    Q    And the initials down the left-hand side of the first

17         and -- you see there's two lines of boxes, or two rows of

18         boxes, columns, I guess is a better word, but they're --

19         strike that.

20           There are two columns of boxes that run down the

21         first and second page, and on each, the left-hand box

22         is -- there's a squiggly in it.

23           Do you see that?

24    A    On the first page, you mean?

25    Q    And continuing onto the top of the second page.
```

25

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 40

```
 1    A    Oh, yes.  Yes.

 2    Q    And that is -- those are your initials, correct?

 3    A    Yes, they are.

 4                              (Exhibit No. 9 marked for

 5                               identification.)

 6    Q    (By Mr. Bauer)  And you signed Exhibit 7 -- excuse me --

 7         you signed Exhibit 8 on October 2nd of 2008, correct?

 8    A    Yes.

 9    Q    Ms. Singley, you've been handed what's been marked as

10         Exhibit 9 to this deposition.

11              What is this document?

12    A    Assessment meeting wrap-up.

13    Q    And down about two-thirds of the way down the page, there

14         are two signatures.

15              Do you see that?

16    A    Yes.

17    Q    The first one is -- appears to be Dana Louise Singley,

18         correct?

19    A    Yes.

20    Q    And the second one appears to be your signature; is that

21         correct?

22    A    Yes.

23    Q    Did you witness -- that is your signature from

24         October 7th of 2010?

25    A    Yes, it is.
```

1    Q    And did you witness your daughter sign this on

2         October 7th of 2010?

3    A    Yes.

4    Q    And on the -- there's two -- again, two columns of boxes

5         on Exhibit 9, and the left-hand box is checked on each,

6         or there's an X through it.

7         Did you make the Xs in those boxes?

8    A    Yes.

9              MR. BAUER:  Let's go ahead and take a

10        bathroom break.

11             MR. CAFFEE:  Okay.

12             THE VIDEOGRAPHER:  The deposition will

13        now go off the record.  The time is 2:23 p.m.

14             (Recess.)

15             THE VIDEOGRAPHER:  We are now back on

16        the record.  The time is 2:31 p.m.  Please proceed.

17             EXAMINATION (Continuing)

18        BY MR. BAUER:

19   Q    Ms. Singley, in June of 2007, Dana stopped residing at

20        the residence on South 67th Street, correct?

21   A    Yes.

22   Q    What is your understanding as to how that came about?

23   A    My understanding is that -- this is what I understood

24        from Dana, and then the facts that appeared afterwards.

25   Q    And let me just back up one step.

27

```
 1    Q   Yes.  And relayed that information to the hospital?

 2    A   Yes.

 3    Q   And that -- strike that.

 4        And you said that Aacres had determined that they

 5        could no longer provide services to Dana; is that right?

 6    A   Yes.

 7    Q   So Aacres made that decision, right?

 8    A   Well --

 9    Q   To the best of your understanding?

10    A   Correct.

11    Q   Through this lawsuit, are you alleging that the

12        Department of Social & Health Services is responsible for

13        that decision that was made by Aacres?

14    A   That's hard to answer that.  I would hope that at least

15        they talked together to make that decision.  If that's

16        the case, you know, I have to ask a question to answer a

17        question, who is responsible?

18    Q   Who do you believe is responsible?

19    A   Whoever -- if it's jointly, whoever decided to do that

20        without allowing any plans.

21    Q   Are you aware of any evidence suggesting that it was DSHS

22        that made that determination?

23    A   I think they were part of the decision.

24    Q   What's that based upon?

25    A   If I recall, and I don't know the facts, when I talked --
```

Page 45

```
 1          finally did talk to Rex, I believe he said in a meeting

 2          with -- and it might have been anita delight, it might

 3          have been the regional person, I don't know, but someone

 4          within DSHS was involved.  It wasn't the case -- it

 5          wasn't Teri O'Donnell.  It was somebody higher up.

 6     Q    How is it that you understand that they were involved?

 7          Just that they had a meeting with Mr. Garrett?

 8     A    Because they were discussing Dana's situation, and I

 9          would have hoped that -- I'm the legal guardian, I would

10          have been part of that.

11     Q    So just to make sure I understand, you believe that DSHS

12          is responsible for that decision because they had a

13          meeting with Mr. Garrett, or may have had a meeting with

14          Mr. Garrett?

15     A    I think it was a joint decision.

16     Q    And the only basis for that is a comment from

17          Mr. Garrett, that he had a meeting with the department --

18     A    Correct.

19     Q    -- someone --

20          You weren't at any such meeting?

21     A    No.  I was not invited.

22     Q    And you have no knowledge whatsoever about what may have

23          occurred, if such a meeting in fact occurred --

24     A    No.

25     Q    -- correct?
```

1              Answer, if you can.

2                   THE WITNESS:  I would answer the

3      question that, whoever collaborates with Aacres to make a

4      decision life-threatening to my daughter would be

5      partially responsible.  Whether that's DSHS, whether it's

6      President Obama, whoever it is.

7   Q   (By Mr. Bauer)  Do you believe that anybody at DSHS

8      intentionally harmed Dana?

9   A   **Intentionally, no.**

10  Q   Do you believe that anybody at DSHS intentionally

11     discriminated against Dana because of her disabilities?

12  A   **Intentionally, no.**

13  Q   Not a single person at DSHS that you can think of; is

14     that correct?  I just want to make sure I understand.

15  A   **I don't think so, no.**

16  Q   You certainly haven't seen any evidence that shows you

17     that happened?

18  A   **No.**

19  Q   Other than what we've already discussed, is there -- what

20     else is -- strike that.

21         Other than what we've already discussed, what else

22     is this lawsuit against DSHS about, in your own words?

23  A   **If indeed they were part of the decision-making, I think**

24     **they failed to provide services for Dana.**

25  Q   And let's -- I understand that, so let's move separate

30

```
 1        and apart from any decision regarding Dana continuing to

 2        reside -- I'm sorry.  I tend to mumble when I get --

 3   A    That's okay.

 4   Q    So let me strike that and back up.

 5             So I want to move away from any decision regarding

 6        Dana continuing to receive services from Aacres.  Okay?

 7   A    Okay.

 8   Q    Is there anything else in the entire universe that this

 9        lawsuit is about with respect to DSHS?

10   A    No.  It involves that incident.

11   Q    And that incident occurred on about June 22nd of 2007,

12        correct?

13   A    I believe so.  I'm not good with dates, but I think so.

14                        MR. BAUER:  Can we make a couple

15        copies real quick?

16                        MR. CAFFEE:  Yeah.

17                        THE VIDEOGRAPHER:  Off the record,

18        Counsel?

19                        MR. BAUER:  Yes, please.

20                        THE VIDEOGRAPHER:  The deposition will

21        now go off the record.  The time is 2:46 p.m.

22                             (Pause in proceedings.)

23                             (Exhibit No. 10 marked for

24                              identification.)

25                        THE VIDEOGRAPHER:  We are now back on
```

31

```
 1        options, such as the use of the mental health crisis

 2        mobile outreach team and/or use of a DDD respite bed and

 3        longer-term options, such as referrals to other supported

 4        living programs, adult family homes, boarding homes or a

 5        residential rehabilitation center."

 6            Did I read that correctly?

 7   A    Yes.

 8   Q    And you spoke with Ms. O'Donnell about all of those

 9        things on June 22nd of 2007, correct?

10   A    Yes.

11   Q    You didn't want -- you did not believe that any of these

12        options were appropriate for Dana at that time, correct?

13   A    I didn't think she needed a crisis bed.

14   Q    And in fact, you were offered a bed at Rainier School for

15        temporary -- for temporary purposes, correct?

16   A    I don't recall that, but -- I don't recall that.

17   Q    Okay.  Are you telling -- is it that you don't remember,

18        or you're saying that didn't happen?

19   A    I don't remember.

20   Q    Okay.

21                              (Exhibit No. 12 marked for

22                               identification.)

23   Q    (By Mr. Bauer)  Ms. Singley, you've been handed what's

24        been marked as Exhibit 12 to this deposition.  This is --

25        I'll represent to you, this is a Waiver Exception-to-Rule
```

| | | |
|---|---|---|
| 1 | | Request that was signed by the Division of Developmental |
| 2 | | Disabilities director, Linda Rolfe, on July 5th of 2007. |
| 3 | | Do you see that? |
| 4 | **A** | **Yes, I do.** |
| 5 | Q | Now, the department has rules about what types of |
| 6 | | services it can and can't provide, right? |
| 7 | **A** | **Yes.** |
| 8 | Q | This document -- I want to make sure I understand that |
| 9 | | your understanding of this document is that the |
| 10 | | department waived some of its rules to provide you with |
| 11 | | services beyond what the rules allowed it to provide.  Is |
| 12 | | that right? |
| 13 | **A** | **Well, I don't know about that, but --** |
| 14 | Q | Well, if you look down at the -- there's a section |
| 15 | | entitled "Justification" that appears to be filled out -- |
| 16 | **A** | **Oh, yes.** |
| 17 | Q | -- with some bold type.  The fourth full paragraph in |
| 18 | | there reads, "Mother's request for in-term home support." |
| 19 | **A** | **Yes.** |
| 20 | Q | And it references -- or it states that you were |
| 21 | | requesting certain services from the department, correct? |
| 22 | **A** | **Yes.** |
| 23 | Q | Is it your understanding that the department waived its |
| 24 | | rules so that it could provide you with those services? |
| 25 | **A** | **Yes.** |

**Judy Singley**
**March 2, 2011**

33

Page 64

```
 1    Q    So the department said, the rules say we can only do this
 2         much, but we're going to waive those rules and do a lot
 3         more, right?
 4    A    Yes.
 5                                (Exhibit No. 13 marked for
 6                                 identification.)
 7    Q    (By Mr. Bauer)  Ms. Singley, you've been handed what's
 8         been marked as Exhibit 13 to this deposition.
 9              Do you see -- this is again, I'll represent to you,
10         a Waiver Exception-to-Rule Request signed by Ms. Rolfe on
11         August 21 of 2007.
12              Do you see that?
13    A    Yes.
14    Q    Where again the department is waiving its rules, to
15         provide you with services beyond what it is technically
16         allowed to provide.
17              Do you see that?
18    A    Yes.
19    Q    And on Page 2, again, there's a section for -- kind of
20         that can be filled in, and the first sentence of that, if
21         you could just follow along with me, it reads, "The
22         emergency respite hours for the previous ETR" --
23         referring to what we marked as Exhibit 12 -- "have not
24         been used.  Dana's mother/guardian has not decided on a
25         contracted provider and has a list of agency 'repite'" --
```

34

1         it appears the "S" is missing -- "providers to choose

2         from."

3             Did I read that correctly?

4    A    Yes.

5    Q    Is that an accurate statement, that you had not decided

6         on a contracted provider, and that the emergency respite

7         hours had not been -- had previously been approved had

8         not been used?

9    A    **But they haven't been used because I didn't know who to**

10        **get in as a respite provider.**

11   Q    But you'd been provided a list of people, correct?

12   A    **I might have, but I would have hoped that somebody would**

13        **walk me through that.**

14   Q    But again, the department's waiving its rules to provide

15        you with what you've been asking for, right?

16   A    Yes.

17   Q    I want to come back to Exhibit 11 for a minute.  And I

18        want you to take as much time as you need to answer this

19        question.  Exhibit 11 continues on, after the paragraph

20        we already read, to discuss a number of different things

21        that the Department of Social & Health Services did

22        between June 22nd of 2007 and May 1 of 2008.

23            I guess my question for you is whether anything

24        that's in here is inaccurate; if you believe that the

25        department didn't do something that it says in this

```
 1        letter it did.

 2            Do you understand my question?

 3   A    Yes.  But I would have to go through this.

 4   Q    And I'd like you to do that, and if you want to go

 5        through paragraph by paragraph, we can do that, or if

 6        it's easier for you to take a minute and just read it and

 7        identify things that you believe are inaccurate, that

 8        would be fine, too.

 9   A    I'll read it.

10   Q    Okay.

11   A    I'm finished.

12   Q    Is there anything in the letter that's been marked as

13        Exhibit 11 that you believe was inaccurate?

14   A    No.

15   Q    Okay.  So if you look at Page 2 just really briefly, one,

16        two, three, four, five paragraphs down, that reads,

17        "During the month of July 2007" --

18   A    Uh-huh.

19   Q    -- do you see that?

20   A    Uh-huh.

21   Q    It references how referrals for supported living services

22        were sent to the 15 providers in Region 5.  So the

23        department sent things -- sent these referrals to more

24        than just the one agency, correct?

25   A    Yes.
```

36

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

 1    Q    And the department offered to send referral packets out

 2         to other regions, right?

 3    A    **Yes.**

 4    Q    And you said no?

 5    A    **Well, Dana and I felt we should be closer together.**

 6    Q    Fair enough.

 7    A    **Uh-huh.**

 8    Q    But you said no?

 9    A    **Yes.**

10    Q    Would you agree that the department worked very hard to

11         provide Dana with services that she needed after services

12         were terminated with Aacres?

13    A    **Yes.**

14    Q    And again, you don't believe that anybody at the

15         department intentionally hurt Dana or you in any way,

16         right?

17    A    **No, not intentionally, no.**

18    Q    And you don't believe that anybody at the department

19         discriminated against you or Dana in any way?

20    A    **No.**

21    Q    Do you believe the department tried to exclude Dana from

22         participating in any program that it offers?

23    A    **No.**

24    Q    So the department didn't prevent Dana from receiving

25         services from another supported living provider --

1   A   No.

2   Q   -- correct?

3       And Dana hasn't been -- well, strike that.

4       In your opinion, has Dana, at any point since June

5       of 2007, been in danger of being institutionalized?

6   A   No.

7   Q   I want to come back to something we were talking about

8       earlier.  Do you believe that DSHS controlled Aacres in

9       any way?

10  A   I wouldn't know the answer to that.  I mean --

11  Q   You wouldn't know one way or the other?

12  A   No, I wouldn't know that.

13  Q   Do you have any evidence that DSHS did control Aacres?

14  A   No.  I don't -- I don't know.

15  Q   Through this lawsuit, are you asking the Court to order

16      DSHS to change anything about its programs?

17  A   Personally I would like to see something for other

18      people, too.

19  Q   Is that related to this lawsuit or something else,

20      though?

21  A   Just a general oversight.  It has nothing to do with the

22      lawsuit.  I would like them --

23  Q   That's okay.  If it has nothing to do with the lawsuit,

24      then it has nothing to do with the lawsuit.

25  A   Okay, okay.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 69

```
 1   Q   Are you claiming, through this lawsuit, that the

 2       department retaliated against you or Dana for doing

 3       something?

 4   A   No.  Can I take that back?

 5   Q   What's -- what do you want to change about that answer?

 6   A   Well, I think it's ironic that this event took place

 7       right after the settlement of the first claim against

 8       them.

 9   Q   The first claim against the department?

10   A   Aacres.  I -- I'm -- I'm getting the two -- it's getting

11       to be a long day.

12   Q   No, that's okay.  And we can take a break in just a

13       moment.  I just want to make sure that we're now on the

14       same page because we were, and now I'm not sure if we

15       are, so --

16   A   Right.  I'm getting --

17   Q   So through this lawsuit, are you claiming that the

18       Department of Social & Health Services retaliated against

19       Dana or you for anything?

20   A   No.

21   Q   Through this lawsuit, are you claiming that DSHS failed

22       to offer Dana services after July of 2007 that she should

23       have gotten?

24   A   No.

25                       MR. BAUER:  Why don't we go ahead and
```

Judy Singley
March 2, 2011

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 86

```
 1    A    No.

 2    Q    Do you know if she ran away when she was with Aacres?

 3    A    They call it running away.  Knowing Dana, as a mother,

 4         she goes for walks.  That's good just for her anxiety.

 5    Q    And you're aware that, on the occasion of the rape, she

 6         was out at 2:30 in the morning walking?

 7    A    She went to get cigarettes, and I also know that her

 8         staff was asleep when Dana left.

 9    Q    And do you know why the staff was still asleep when

10         she -- when Dana left?

11    A    They were supposed to be awake.

12    Q    And --

13    A    So I don't know why.

14    Q    Why do you believe that they were supposed to be awake?

15    A    Because they had the night shift.  She had 24-hour care,

16         so they took shifts.

17    Q    That's your understanding?

18    A    That's my understanding.

19    Q    Do you know when they went to 24-hour care with night

20         shifts?

21    A    I don't know.

22    Q    Did Dana ever tell you that she snuck out?

23    A    I think she did a couple of times to visit her friend.

24    Q    Did she tell you she snuck out on the occasion of the

25         rape?
```

40