Transcript of the Testimony of

**Kimberly Calkins**
April 11, 2011

**Singley v. Aacres Landing, Inc., et al.**
No. C09-5443 RBL



**Byers and Anderson, Inc.**
**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Tacoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 14

```
2    Q    So during the time period of Dana Singley's services

3         being terminated, as I'm understanding the timeline, you

4         were the regional director at that time?

5    A    At that time.
```

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

14   Q   Okay.  Having seen Exhibit 23 and Exhibit 24, have you

15       been able to recollect either of these incidents?

16   A   Distantly.

17   Q   Sure, I understand.  It's been several years.

18   A   Yeah.

19   Q   From what you know about Dana's care during the period of

20       late 2006, the first six months of 2007, were these

21       incidents frequently recurring, these types of incidents,

22       the ones encapsulated in Exhibit 23 and Exhibit 24?

23   A   We could go back and look and see just -- without

24       trusting on my memory.  I believe they happened

25       frequently, but we could also verify that with the

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 30

1          incident reports.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 39

```
11    Q    All right.  The date on this incident was 1/17/07.  It

12         looks like this one is involving sort of a fight or a

13         verbal exchange between Dana and her neighbor.

14              Is it your understanding that Dana and her neighbor

15         would consistently have these verbal altercations?

16    A    I seem to recollect a lot of verbal exchanges.
```

Page 53

14    Q    Okay.  Let's look at Exhibit 30.

15         Do you recognize this document?

16    A    Yes.

17    Q    And you submitted this document; is that right?

18    A    Yes, I did.

19.   Q    And this is an incident report on 4/29/07?

20    A    That's correct.

21    Q    It looks like again we have an altercation between Dana

22         and her neighbor.

23    A    Yes.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 57



```
23    Q   Okay.  Let's get to Exhibit 31.

24            Do you recognize this document?

25    A   Yes, I do.
```

```
 1    Q   And this is an incident report submitted by Terri Moore

 2        on 6/13/07?

 3    A   Yes.

 4    Q   It looks like police were involved here.

 5    A   It would appear so.

 6    Q   Can you read for me the Administrative Response?

 7    A   "There were three staff on site when the incident

 8        occurred and all were attempting to coach the clients

 9        during the incident.  Plans were followed and CRU was

10        notified."

11    Q   What's CRU stand for in that case?

12    A   Complaint Resolution Unit.

13    Q   Complaint -- what does that mean?

14    A   That's a State agency.
```

Page 62

```
22          Do you recognize Exhibit 34?

23     A    Yes.

24     Q    And -- so let's talk about the antecedent.  Can you read

25          the antecedent there?
```

1    A    "Aacres had given DDD a 72-hour emergency notice of

2         circumstances endangering the health and safety of Dana

3         and the need to terminate our residential supports to her

4         as soon as possible.  DDD informed us that they had made

5         contact with DDD crisis services to inform them of the

6         situation.  Dana was also informed of this notice and was

7         upset."

8    Q    Were you notified of the notice of -- of this 72-hour

9         emergency notice of circumstances?

10   A    Yes, I was notified that we were giving it.

11   Q    Were you notified after it was given, or before?  After

12        it was given to Dana, I guess, or Dana and Judy, I

13        suppose it would be?

14   A    I believe that I was notified -- I was notified before

15        they had given it to Dana.

16   Q    Was this in a -- in what context were you notified?

17        Meeting?  Phone call?

18   A    The immediate details, I want to say that I talked with

19        Sandi individually about it, and that she had told me.

20        And actually, I think Rex had told me.  Again, this was a

21        while ago.  I was told that we were giving it.

22   Q    Were you told what the nature of the circumstances

23        endangering the health and safety of Dana, were you told

24        what those were?

25   A    I believe -- they did not review everything with me.

Page 64

```
 1          They were concerned about Dana accepting help and being

 2          able to work with us, in that she was refusing to accept

 3          services, accept coaching.

 4               As you read farther down the incident report, she

 5          was being very verbally aggressive towards others,

 6          threatening to kill them, including myself, which would

 7          make it difficult for me to help her.

 8     Q    Did she threaten you directly?

 9     A    I wasn't there.  She verbally told -- as it said, to the

10          staff and people around her.

11     Q    So she never told you face-to-face that she was going to

12          kill you?

13     A    At that time?

14     Q    Sure.  At that time.

15     A    At that time.

16     Q    At any time?  Has Dana ever told you that she was going

17          to kill you, in person?

18     A    I believe that her quote was "Die in hell, bitch."  At

19          this time -- I mean, that's not the time she told me,

20          but --

21     Q    Sure.  So she was becoming more difficult.  She was maybe

22          not accepting the -- as you say, there were concerns that

23          she was not accepting the help that was being provided.

24               So in your mind, what was it -- what was the nature

25          of the incident that prompted the decision to terminate
```

1        the services?

2                        MR. LA PORTE:  Objection.

3    Q   (By Mr. Carson)  You can answer.

4                        MR. BAUER:  Join.

5                        THE WITNESS:  I don't know if it was

6        one incident or was becoming a pattern of her refusing to

7        accept.

Page 73

```
6    Q    (By Mr. Carson)  How many times did you, roughly, have an

7         opportunity to go to her home?

8    A    I couldn't even tell you roughly how many times.

9    Q    More than ten?

10   A    Probably.

11   Q    More than 20?

12   A    You're talking about a long span of time.  I've been

13        there, I can tell you, probably -- definitely more than

14        ten.  Frequently, probably not, because Dana wouldn't

15        allow me in.

16   Q    So let's talk about just in the time period between --

17        you know, all these exhibits we've been working with,

18        from about midsummer of 2006 to July of '07.

19            Did you have any occasion to go to her home during

20        that period?

21   A    Oh, I'm sure that I did go to her home in that period.

22   Q    And during that period, what was the condition of her

23        home like?

24   A    Very Dana.

25   Q    Explain what you mean by that.
```

1    A   Exactly where Dana wanted everything.  If I went through

2        and made a suggestion about something, she said, "I told

3        people not to move it.  I'll take care of it later."

4    Q   There's been some testimony that there was rotten food in

5        her home.  Did you ever experience or see that?

6    A   I saw dirty dishes that she told me not to clean.

7    Q   There's also been testimony that there was vomit -- dried

8        vomit in the home.  Did you ever have an occasion to see

9        that?

10   A   I don't remember dry vomit.  Again, I go back to what

11       Dana would allow or wouldn't allow.

12   Q   So staff -- allow me to just try to understand what

13       you're saying.  They've got a responsibility -- staff

14       have a responsibility to clean the house, but only to the

15       extent that she allows?  Is that what I understand you to

16       be saying?

17               MR. LA PORTE:  Objection.

18       You may answer.

19               THE WITNESS:  To the extent that Dana

20       would allow you to clean, staff would be prepared,

21       including myself, to go and help her.  But when Dana

22       looks at you and says, "Don't touch my dishes, don't mess

23       with my stuff, I don't want you to do that, and if you

24       do, I will do X, Y, Z," whatever it was, you're probably

25       going to leave the dishes alone.