UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JUDY SINGLEY, individually and as Guardian for DANA LOUISE SINGLEY,<br><br>Plaintiff,<br><br>v.<br><br>AACRES/ALLVEST, LLC, a Limited Liability Corporation, and the STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, DIVISION OF DEVELOPMENT DISABILITIES.<br><br>Defendants. | CASE NO. 09-cv-5443 RBL<br><br>ORDER |

This matter comes before the court on motion of Defendant AACRES Landing East, Inc. for Summary Judgment [Dkt. #62]. The Court has considered the pleadings filed in support of and in opposition to the motion, and the remainder of the file. Oral argument is unnecessary for resolution of the motion. The motion is GRANTED.

ORDER - 1

Statement of Facts

The facts relevant to the resolution of this motion are not in dispute. The conduct of both parties leading up to the termination of the contract by Aacres is not challenged. This case involves Washington's Home and Community Based Services ("HCBS") waiver program. The waiver program is designed to provide community-based alternatives to Immediate Care facilities for developmentally-disabled adults by enabling qualified individuals to remain more integrated in their communities than if they were institutionalized. See WAC 388-845-0005, et seq. (2007).

Washington's HCBS waiver programs are regarded as a "genuine, comprehensive and reasonable" alternative to institutionalization. *Arc v. Braddock*, 427 F.3d 615, 621 (9th Cir. 2005). Participating in an HCBS waiver program is voluntary, both on the part of the recipient and the service provider. The state contracts with third parties to provide "residential services and support" to such qualified individuals, enabling them to live in their own homes. *See*, e.g., RCW 71A.12.010, 040; WAC 388.101.1180 and 388.101.1240 (2006 and 2007 eds.). Aacres held such a contract with the state and provided such services to Dana Singley from January 1, 2000 to June 22, 2007, at which time Aacres chose, in accordance with the contract, to terminate its services to Dana Singley. The contract in effect at that time was for July 1, 2006 through June 30, 2007.

The purpose of the service program is to provide "Positive Behavior Support," which is defined as "a supportive environment for an individual to learn how to get his or her needs met without resorting to behaviors that are considered unacceptable;" and to provide "supported living" defined as "residential services provided to clients living in their own homes, which are owned, rented, or leased by the clients or their legal representatives." [Contract ¶1.1, Exh. 1 to

Decl. of Cheryl Borden, Dkt. #64.] *See* WAC Chapter 388-101. The goal is to provide positive assistance for developing coping skills in such areas as shopping for food and clothes, money management, cooking and cleaning, bus riding, and attending doctor appointments. These activities are specifically tailored by the state to individuals in what is known as an "Individual Service Plan/Plan for Care (ISP/POC)."

Dana suffers from mild Asperger's Syndrome, Oppositional Defiant Disorder, Bipolar Disorder, and Deficit Hyperactivity among other disabilities. Dana's plan was prepared by her case worker, Teri O'Donnell, and specifically covered: fire safety training, training with preparing foods, home management tasks, assistance with managing finances, accessing community resources and transportation, and teaching positive behavior. Occasionally, she was to receive assistance in pursuing paid, part-time employment, registration for high school classes, and transportation to and from employment. She also was to receive assistance with necessary medical and dental care scheduling and appointment attendance. All of these activities require willing participation by the service recipient.

In situations in which the continued presence of a service recipient "endangers the health, safety, and/or personal property of other clients, those working with the client, the client him/herself, or other citizens of the community, the Contractor shall notify the DDD Field Services representative to request emergency assistance." [Contract, ¶ 3c(1).] The Contract further provides that "either the Contractor or DSHS may terminate the client from the program." [Contract ¶ 3(c)(f).] In an emergency situation, following termination by either the DSHS or the Contractor, the state shall remove the client from the program within 72 hours.

The Contract also provides the Contractor "the right to refuse services to a client when the Contractor has determined and documented that the client's needs cannot be met by the

Contractor, or the refusal of services would be in the best interest of the client or the best interest of other clients. After such determination by the Contractor, the Contractor shall furnish written notice to the DDD within ten (10) working days." [Contract, ¶ 3(b).]

Dana Singley is very intelligent, but lacks the ability to make good choices and decisions relative to her own well being. She is described as a person who strives for her independence without recognition of the dangers that certain actions might pose.

On January 1, 2000, Dana Singley, then 18, enrolled in the service program and received services from Aacres. During the initial years, she was assigned staff who would work and live with her at a residence for which she paid rent. Prior to July 30, 2003, the staff person would be on shift for 24 hours a day for 7 days and then alternate with another staff person on a weekly basis. The live-in staff person was entitled to breaks and eight hours for sleep.

At 2:00 a.m. on July 30, 2003, while her staff person was asleep, Dana Singley left to buy cigarettes at a convenience store in the Manitou district of south Tacoma. The store was closed but she approached a stranger for purposes of "bumming" a cigarette. Dana was raped. Dana and her mother sued Aacres for negligent supervision. The case was settled in March 2007 and the Court approved the settlement on May 25, 2007.

Following the rape, the State paid Aacres to increase Dana's staff to three shifts of individuals, each on duty for eight hours, seven days per week, with the goal of having someone always awake and available to supervise Dana Singley, day and night. They were not to restrain Dana from leaving the apartment. In addition, an alarm system was installed, which Dana deliberately sabotaged.

Initially, Dana was somewhat compliant following her rape. She became more aggressive in her behavior during the several month period prior to June 2007. Dana directed

aggressive conduct and insulting, vulgar language at her staff.  She painted their names with expletives on walls and doors.  She frequently locked them outside and attempted to elude them.  On one occasion, she sprayed Raid under the staff room door while a staff person was inside.  She had physical altercations with her neighbors.  In the last six to twelve months prior to her termination, between 20 and 40 staff members who had worked with Dana Singley resigned from the company, or refused to work with her any longer.

In January, 2007, at a meeting with Terri Moore, Cheryl Borden, Teri O'Donnell, Dana Singley demanded (and her mother agreed) that Dana should be given 15 minutes "alone time" in the community to go wherever she chose during daylight hours without any accompaniment or surveillance by Aacres staff.  The Aacres staff was concerned that she could easily get on a bus or rendezvous with an unknown person.

On June 13, 2007, Dana was involved in a physical altercation with a neighbor residing in the triplex who was also a client of Aacres.  The altercation involved pinching, biting, and facial slapping.  The police were called.  Three days later, on June 16, Dana caused a disturbance at a Jack-in-the-Box restaurant, and the store manager threatened to call the police.  On the trip home, Dana scratched and stabbed herself with a pen, yelled obscenities, and screamed at the staff and the neighbor client, and threatened to kill herself.  Again the police were called, and this time Dana was transported to crisis triage at Puget Sound Hospital.

Six days later, on June 22, Rex Garrett, CEO and co-owner of Aacres, gave formal contract termination notice to the state.  The state's representative, Denise Pech, consulted with Garrett and requested up to 72 hours to remove Dana from the Aacres program.  Garrett agreed, but said he would not provide service if subsequent conduct by Dana might threaten her, her neighbors, her staff, or the public at large.

Aacres informed Judy Singley of the termination on Friday, June 22. When Dana was informed of the termination, she reacted by physically breaking the staff room door and threatening to kill staff members. The police were called, and they removed her that evening to triage at Puget Sound Hospital, pending release to her mother.

## Summary Judgment

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue of trial." *Celotix Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

Against the backdrop of persistent uncooperative and indeed, threatening behavior on the part of the client, Dana Singley, Aacres gave notice of termination. The parties to the contract immediately consulted one another and the state representative confirmed that Dana would be removed from Aacres care within 72 hours. Dana's mother, Judy, was informed of the termination the same day. The contract provides for 10 days notice, or a 72-hour emergency termination, depending on the circumstances. Dana's conduct, however, sabotaged any further

Aacres informed Judy Singley of the termination on Friday, June 22. When Dana was informed of the termination, she reacted by physically breaking the staff room door and threatening to kill staff members. The police were called, and they removed her that evening to triage at Puget Sound Hospital, pending release to her mother.

## Summary Judgment

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue of trial." *Celotix Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

Against the backdrop of persistent uncooperative and indeed, threatening behavior on the part of the client, Dana Singley, Aacres gave notice of termination. The parties to the contract immediately consulted one another and the state representative confirmed that Dana would be removed from Aacres care within 72 hours. Dana's mother, Judy, was informed of the termination the same day. The contract provides for 10 days notice, or a 72-hour emergency termination, depending on the circumstances. Dana's conduct, however, sabotaged any further

services from Aacres.  The contract provided for a termination process that was thwarted by Dana's continued threats and property damage immediately upon the notice of termination. Aacres did not breach the contract, and there is no evidence to support the claims of retaliation for violation of the Americans with Disabilities Act (ADA) or the Rehabilitation Act.

A.   Plaintiffs' ADA and Rehabilitation Act Claims are Dismissed.

Title II of the ADA provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any executive agency .
> . . .

29 U.S.C. § 794(a).

By statute, the remedies for violations of the ADA and  the Rehabilitation Act are co-extensive with each other and are linked to Title VI of the Civil Rights Act of 1964.  42 U.S.C. §12133; 29 U.S.C. §794a(a)(2); 42 U.S.C. §2000d-7(a)(2); *Ferguson v. City of Phoenix*, 157 F.3d 668, 673 (9th Cir. 1998), *cert. denied*, 526 U.S. 1159 (1999).  Compensatory damages are not available under either Act absent a showing of intentional discriminatory behavior. *Ferguson*, 157 F.3d at 674.  Further, the Rehabilitation Act does not afford a right to relief without demonstrating exclusion from a covered program.  *Hutchison v. Spinz*, 126 F.3d 895, 901 (7th Cir. 1997).

The test to determine whether discrimination has occurred under either act is the same. *Lincoln CERCPAC v. Health and Hospitals Corp.* 920 F. Supp. 488 (S.D.N.Y. 1996).  To prove that a defendant violated the ADA, a plaintiff must show that she is a qualified individual with a disability; that she was either excluded from participation in or denied benefits of the defendant's services, programs, or activities or was otherwise discriminated against by the defendant; and that such exclusion, denial or discrimination was by reason of her disability.  *Weinreich v. Los Angeles Cty. Metro. Transp. Auth.,* 114 F.3d 976 978 (9th Cir. 1997), *cert. denied* 522 U.S. 971 (1997).

To state a claim under the Rehabilitation Act, a plaintiff must prove that: (1) she was a handicapped individual, (2) she was otherwise qualified for the benefit sought, (3) she was denied the benefit and discriminated against solely by reason of her disability; and (4) the program or activity in question received federal financial assistance.  *Id.*  The discrimination must result from the handicap alone.  *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1493 (10th Cir. 1992), *cert. denied*, 507 U.S. 910 (1993).

The contract between the state and Aacres was performed and terminated in accordance with its provisions.  The Contract gives the Contractor the right to terminate its services at the end of the term upon the failure of a client to accept the services, or in an emergency.  Aacres notified the state it was terminating its services for Dana.  She had been uncooperative for some time, and had repeatedly engaged in destructive and threatening behavior.  This conduct, coupled with Dana's insistence on unsupervised time periods, presented an ongoing risk to Aacres, including potential liability.

The state advised Aacres that it would remove Dana from Aacres within 72 hours. Neither the state nor Aacres indicated that Dana would be excluded from the benefit of any other

service providers.  Only Dana Singley's bad behavior prevented the notice and termination process from being completed.  Intervention by the police followed by hospitalization, were reasonable responses by Aacres, the state, the police and Puget Sound Hospital.  Whether Dana Singley was an incidental beneficiary or a third party beneficiary of Aacres' contract with the state does not change the rights and obligations of Aacres, or the state.  The contract was properly terminated according to its terms.

B. <u>The Plaintiff's Breach of Contract is Dismissed for the reasons stated above.</u>

C. <u>The Plaintiff's Claim under 42 U.S.C. § 1983 is Dismissed</u>.

Per the Court's order of December 10, 2010 [Dkt. # 47], Plaintiffs' §1983 claim is dismissed because § 1983 does not apply to private corporations.

D. <u>Plaintiff's Claim of 14th Amendment Violation is Dismissed</u>.

Per the Court's Order of December 10, 2010, Plaintiffs' 14th Amendment claim is dismissed.  The claim is without merit.

E. <u>Plaintiff's Claim of Breach of Fiduciary Duty/Special Relationship Claim is Dismissed</u>.

Regardless of status either because of a fiduciary duty or special relationship between Aacres and Singley, the fact remains that the COPES program does not deliver services for DDD (Division of Developmental Disabilities) clients.  Singley's case manager employed by the state, Teri O'Donnell, has testified that DDD clients, like Singley, are not eligible and do not receive COPES benefits.

//

//

CONCLUSION

For the foregoing reasons, the motion for summary judgment [Dkt. #62] is GRANTED and the action is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated this 7th day of September, 2011

_____
Ronald B. Leighton
United States District Judge